UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**LANDMANN WIRE ROPE PRODUCTS, INC.**        CIVIL ACTION

**VERSUS**        NO:   20-646

**MARINE SPLICING AND SUPPLY, INC.**        SECTION: "B" (4)

REPORT AND RECOMMENDATION

Before the Court is Plaintiff's, Landmann Wire Rope Products, Inc. ("Landmann"), **Motion to Enforce Settlement Agreement (R. Doc. 39)** seeking the Court enforce the settlement agreement between Defendant, Marine Splicing and Supply, Inc. ("Marine Splicing") and Landmann in which Marine Splicing agreed to pay Landmann $55,000.00 in exchange for the dismissal of Landmann's claims in this suit against Marine Splicing. This motion is not opposed.

Also, before the Court is Third-Party Defendant's, Gator Supply Company, L.L.C. ("Gator Supply), **Motion to Enforce Settlement Agreement (R. Doc. 42)** seeking the Court enforce the settlement agreement between Marine Splicing and Gator Supply in which Marine Splicing agreed to dismiss its claims against Gator Supply and enter into a non-disparaging agreement. Marine Splicing filed an opposition to this motion. R. Doc. 52. Gator Supply filed a reply. R. Doc. 58.

This matter was referred to the undersigned United States Magistrate Judge for hearings and resolution including a report and recommendation pursuant to Title 28 U.S.C. § 636(b)(1)(B) and (C), § 1915e(2), and § 1915A, and as applicable, Title 42 U.S.C. § 1997e(c)(1) and (2). R. Doc. 43.

On April 1, 2021, the Court held a status conference to discuss the status of the settlement. R. Doc. 56. The parties stated none of the issues had been resolved. As such, the Court closed the submission period, and submitted the matter on the briefs. *Id.*

I.        **Background**

A. **Underlying Claim**

On February 21, 2020, Plaintiff Landmann filed the instant complaint against Marine Splicing based upon the Court's diversity jurisdiction and pursuant to Louisiana's open account statute as well as breach of contract. R. Doc. 1. Landmann alleged that in 2015 that Landmann and Marine Splicing began engaging in business with each other involving various wire rope products. *Id.*

The first aspect of the business relationship involved Marine Splicing's purchase of wire rope products from Landmann. *Id.* Landmann contends that by February 2017, Marine had fallen into debt on the account, but acknowledged the indebtedness and began making monthly payments to Landmann in an attempt to pay off its open account. *Id.* In November 2019, Landmann made a formal demand on the outstanding balance due in the principal amount of $37,987.15. *Id.* Landmann also alleges this principal amount has been accumulating interest at a rate of 1.5% per month since September 2015. *Id.*

The second aspect of the business relationship involved Marine Splicing storing various wire rope products at its Louisiana warehouse for Landmann's benefit. *Id.* Landmann alleges that it delivered over $100,000 worth of wire rope products to Marine Splicing for safekeeping between 2013 and 2017. *Id.* Landmann further alleges that as of March 2017 that Marine Splicing had misplaced approximately $41,393.39 worth of the wire rope products that Landmann had entrusted to Marine Splicing for safekeeping. *Id.*

On April 22, 2020, Marine Splicing filed a third-party complaint against Gator Supply for breach of contract, unjust enrichment, quantum meruit, and indemnification. R. Doc. 13. Marine Splicing alleges that for the past twenty (20) years that Marine Splicing and Gator Supply have had

a working business relationship. Marine Splicing acted as a manufacturer and supplier of various wire rope products, which Gator Supply would sell those products. *Id.*

Marine Splicing further alleges that Landmann, Gator, and Marine Splicing entered a contract for the storage of certain rope products after a third-party company, Halo Wire Rope ("Halo"), went out of business. *Id.* Halo and Landmann had entered into a distributorship agreement, in which Landmann acted as wholesale distributor of wire rope product that Halo would purchase. *Id.* When Halo, a New Orleans based company, went out of business, rather than ship the material back to Landmann, which is a California based company, Landmann sought to find a suitable New Orleans area location to store the material rather than face return shipping costs. *Id.*

Marine Splicing further alleges that Gator Supply took the lead and acted as primary contact with Landmann for the relocation of the Halo inventory. *Id.* Gator Supply and Marine Splicing agreed to the transfer of the Halo to Marine Splicing's property, in which Gator Supply was already using to store certain materials. *Id.* Marine Splicing alleges that the inventory was sent directly who Gator Supply took possession. *Id.* Marine Splicing also alleges that a sublease was executed between itself and Gator Supply stipulating the conditions of the inventory storage to include an indemnification for loss of products provision. *Id.*

Marine Splicing alleges that Gator Supply and Landmann had a discussion that Marine Splicing would be unable to keep its financial commitment so chose to transfer the inventory elsewhere. *Id.* Marine Splicing states that the inventory was loaded onto eight (8) eighteen-wheeler trucks, but it has no records of what happened to the disposal, retention, or transfer of the material after that. *Id.*

Marine Splicing, therefore, alleged that to the extent that Plaintiff Landmann seeks to hold Marine Splicing liable that Marine Splicing seeks indemnification from Gator Supply for the

inventory at issue. *Id.* Marine Splicing finally alleges that Gator Supply owes an unspecified amount of money under the sublease with Marine Splicing. *Id.*

### B. The Settlement Dispute

On September 28, 2020, the undersigned held a Settlement Conference with all parties. R. doc. 35. Negotiations were successful, a settlement was reached, and the agreement was recorded by court reporter. *Id.* The settlement agreement confected involved all three parties and had two main aspects. R. Doc. 39-2.

First, Landmann agreed to "resolve this matter for a payment by Marine Splicing and Supply in the amount of $55,000." R. Doc. 39-2, p. 3. Rick Colvin for Marine Splicing consented. R. Doc. 39-2, p. 4. Charles A. Rareshide, Jr., representing Marine Splicing and Supply, Inc., stated into the record "I do confirm and consent to this agreement of $55,000 to settle." R. Doc. 39-2, p. 4.

Second, in addition to the monetary terms between the main parties, the third-party demand was also resolved. *Id.* On the record counsel for Marine Splicing stated "[b]etween the parties, that will be Gator Supply and Marine Splicing, those matters will be dismissed with a non-disparagement agreement to be had between both parties." *Id.* Mr. Rareshide on the record also stated, "I agree to the non-disparagement agreement between Marine Splicing and Supply, Inc., and Gator Supply." R. Doc. 39-2, p. 5. The District Court, accordingly, entered an Order dismissing the case on September 30, 2020. R. Doc. 36.

Four months have since lapsed, and Marine Splicing has failed to make the agreed upon payment or even a partial payment. R. Doc. 39. Marine Splicing stated both at the April 1, 2021 status conference and in its pleadings that that it intends to fulfill its obligation incurred with Landmann. *See* R. Doc. 52.

Notwithstanding, now nearly four months after the dismissal, Marine Splicing maintains that it did not intend to release Gator Supply from monetary liability through a simple non-disparagement agreement. R. Doc. 52, p. 4. Marine Splicing has since terminated its counsel present at the settlement conference and has retained a new attorney. Marine Splicing now contends that Rareshide was not there for the entire settlement conference, but only at the end when the agreement was placed on the record. *Id.* Rareshide contends that he believed that the "non-disparagement agreement" meant that there would be confidentiality between all parties and the discussions that took place during the settlement conference and not that the lease matters, which Marine Splicing contends is over $100,000, against Gator Supply were resolved solely with a non-disparagement agreement. *Id.* As such, Marine Splicing maintains that there was no meeting of the minds when the compromise was reached and, therefore, the settlement should not be enforced. *Id.*

## II.   **Standard of Review**

Where the substantive rights and liabilities of the parties derive from state law, state law governs the enforcement of the settlement agreement. *Rice v. Hanover Ins. Co.*, No. CIV.A.07-6245, 2009 WL 1564811, at *1 (E.D. La. June 1, 2009) (citing *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 206 (5th Cir. 2007) ); *see also Lege v. Wal-Mart Louisiana LLC*, No. CIV.A. 07-01694, 2009 WL 5195949, at *3 (W.D. La. Dec. 30, 2009). Here, the substantive rights and liabilities arise from the laws of Louisiana and Louisiana Civil Code Article 3071 ("La. Civ. Code art. 3071") will govern the enforcement of the settlement agreement. *Rice*, 2009 WL 1564811 at *1.

An agreement is enforceable under La. Civ. Code art. 3071 if "1) it has been reduced to writing; or 2) it has been recited in open court and is capable of being transcribed from the record of the proceedings." *Id.* (emphasis in original). Thus, a settlement on the record is "unquestionably sufficient to meet the writing requirement set forth in Article 3071." *Id.* Furthermore, "recital of

such agreements in open court must make full disclosure of the terms so that all parties concerned are fully advised and informed of their rights and obligations." *Kearns & Associates Co. v. Carter*, No. CIV.A. 10-439-SCR, 2014 WL 200425, at *1 (M.D. La. Jan. 17, 2014) (citing *Troxclair v. St. Charles Parish*, 450 So.2d 759, 761 (La. App. 5 Cir. 1984) ). The settlement agreement shall be valid "only if there is a meeting of the minds between the parties as to exactly what they intended when the compromise was reached." *Abadie v. Metro. Life Ins. Co.*, 712 So. 2d 932, 934 (La. App. 5th Cir. 1998).

### III.  Analysis

The Court first addresses Landmann's Motion to Enforce Settlement Agreement. R. Doc. 39. This motion is not opposed by Marine Splicing, and, in fact, Marine Splicing stated in its pleadings and at the April 1, 2021 Status Conference that it is sending the check for $55,000 as contemplated in the settlement agreement placed on the record before undersigned. Notwithstanding, the Court has received email communications that no check was ever received. The Court does not find this issue of dispute. Marine Splicing has represented to the Court on multiple occasions that it intends to fulfill this aspect of the settlement agreement. The Court will enforce that aspect of the settlement.  Landmann's motion should therefore be granted by this Court..

The Court turns next to Gator Supply's Motion to Enforce Settlement Agreement in which Marine Splicing was to release Gator Supply of all monetary claims in exchange for execution of a non-disparagement agreement. *See* R. Doc. 42. Gator Supply seeks that the agreement be enforced as stated on the record. *Id.* Marine Splicing, however, argues that there was no true meeting of the minds as it did not intend to release Gator Supply of the claims for outstanding lease payments. R. Doc. 52. Marine Splicing further contends, even though his attorney was present throughout the entire settlement conference, he was only there briefly to note his consent to the agreement on the

record. *Id.* Marine Splicing now argues this led him to agree to things out of context and not thoroughly explained to him. *Id.*

Here, the settlement agreement was recited in open court and transcribed by a court reporter on September 28, 2018. The agreement, therefore, is enforceable pursuant to Louisiana law. *See Deep S. Equip. Co. v. Jones Motor Grp., Inc.*, No. CV 18-2164, 2019 WL 302840, at *2 (Roby, M.J.) (E.D. La. Jan. 3, 2019), *report and recommendation adopted*, No. CV 18-02164, 2019 WL 296870 (E.D. La. Jan. 23, 2019)

The Court finds Marine Splicing's argument that there was no meeting of the minds unavailing. Here, the Court clearly indicated on the record in open court that both in the main claim and third-party demand would be resolved through the settlement. In addition, the Court broke down the agreement into different parts for clarity's sake. The Court specifically stated on the record that the claims between Marine Splicing and Gator Supply would be dismissed with a non-disparagement agreement to be had between both parties. Rareshide then indubitably agreed to the non-disparagement agreement on behalf of Marine Splicing.

Rareshide is a sophisticated businessman who was in the best position to question the impact of the settlement on other claims but failed to speak up during the placement of the terms of the settlement on the record. *See Deep S. Equip.*, 2019 WL 302840, at *3 (finding motion to enforce should be granted where defendant failed to speak up during the reading of settlement into record that included the waiver of all claims that are among the other defendants). Yet, no clarification was sought, no additions were added, and no one contested the dismissal. *See Saeed v. Kamboj*, No. CV 17-13427, 2019 WL 3526710, at *2 (Van Meerveld, M.J.) (E.D. La. June 21, 2019) (granting motion to enforce settlement).

"The fact that parties to an agreement later dispute the meaning of a term does not in and of itself mean that the term is ambiguous, let alone that there was no meeting of the minds." *Id.*, at * 7 (citing *Esplanade Oil & Gas, Inc. v. Templeton Energy Income Corp.*, 889 F.2d 621, 623–24 (5th Cir. 1989) ("The fact that one party can, in hindsight, create a dispute about the meaning of a contractual provision does not render the provision ambiguous.")). "When the words of the contract are clear and unambiguous and lead to no absurd consequences, no further inquiry may be made into the parties' intent." *Id.*

Here, it is clear to the Court after an hour and forty-five minutes of discussion that the parties knew exactly what they were agreeing to. The transcript of the agreement placed on the record in open court memorializes the parties' intent to settle all claims—both the main complaint and third-party demand—and dismiss the suit. As the words of the contract are clear, the Court need not inquire further into the parties' intent.

Moreover, the Court finds Marine Splicing's argument that Rareshide was not present the entirety of the time that the settlement was being confected unavailing. Louisiana courts are clear that a plaintiff's attorney's judicial confession in open court under La. Civ. Code art. 1853 that he had the authority to settle plaintiff's claim binds the plaintiff. *See Jason v. Par. of Plaquemines*, No. CV 16-2728, 2017 WL 993152, at *3 (Vance, D.J.) (E.D. La. Mar. 15, 2017) (citing *Singleton v. Bunge Corp.*, 364 So. 2d 1321, 1325 (La. Ct. App. 1978) ("[B]ecause a client speaks through his attorney in court, any statement made by the attorney is held to be an admission by the client.")).

Here, while Rareshide may not have been present throughout the settlement conference, his attorney was present the entire time during both communal discussions with opposing counsel and during break out discussions with the Court. Marine Splicing's counsel stated on the record "[b]etween the parties, that will be Gator Supply and Marine Splicing, those matters will be

8

dismissed with a non-disparagement agreement to be had between both parties." R. Doc. 39-2, p 4. Rareshide then acknowledged and consented to the same. R. Doc. 39-2, p. 5.

So, like the court in *Singleton* found that the judicial confession in open court was sufficient grounds to enforce the settlement, the Court finds the same here.

### IV.     Recommendation

Accordingly,

**IT IS RECOMMENDED** that Landmann's **Motion to Enforce Settlement Agreement (R. Doc. 39)** and Gator Supply's **Motion to Enforce Settlement Agreement (R. Doc. 42)** be **GRANTED.**

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a Magistrate Judge's Report and Recommendation **within fourteen (14) days** after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. *See Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996).[1]

New Orleans, Louisiana, this 6th day of May 2021.

**KAREN WELLS ROBY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**

---

[1] *Douglass* referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend the period to fourteen days.